LEIGH M. CLARK, Retired Circuit Judge.
The record in this case discloses that in February 1983, this appellant was tried in the Etowah County District Court and convicted of “criminal trespass in the third degree” as proscribed by Alabama Criminal Code, § 13A-7-4, and by the same court was tried and convicted of “resisting arrest” as proscribed by Alabama Criminal Code § 13A-10-41. He duly appealed such convictions to the Circuit Court of Etowah County, where the appealed cases, bearing Circuit Court Nos. 83-128 and 83-129, came on for trial in August 1983. By agreement of parties, the cases were consolidated for trial in the trial court, and a jury found defendant guilty in each case. The court duly adjudged him guilty in each case and fixed his punishment at a fine of $100 in each case. He has appealed from the judgments in both cases in the circuit court, and both parties have treated the cases as having been consolidated on appeal to this court.
*512 There is no indication by the record or the transcript of the evidence that defendant ever had an attorney in the cases from the time charges were brought against him in the district court until the present time. He handled the cases pro se in the trial courts and has filed a pro se brief in this court, as well as a pro se brief in reply to the appellee’s brief, wherein he urges a reversal of the judgment of the circuit court in each case.
The first witness testifying on call of the State was Mr. Melton Terrell, who operated the Mountain Top Flea Market on one side of Highway 278 in Etowah County consisting of approximately sixty acres of land. He described the flea market as one in which he sold “sellers permits to dealers and they come in and they set up their merchandise and they sell, and I have a compound in which they sell in” and which “is marked off and it is isolated from the buying public, and the buying public comes in and they park and then they conduct business.” He said the incident constituting the basis of the cases being tried occurred on a Sunday and that “a great number of people” were there. According to his testimony, he had employed “three persons to handle either traffic or security” and that two of them were “police officers” of the City of Gadsden. Upon being asked what called his attention to Mr. Brooks, he said:
“There was a dealer came to the gate house and informed Officer Wilkes and Officer Helen Wilkes that Mr. Brooks was giving him a certain amount of hassle, and they in turn called me and officer Don Wilkes and Officer Helen Wilkes met at where Mr. Brooks parked.”
According to Mr. Terrell’s further testimony, he told Mr. Brooks he would like for Mr. Brooks to leave the flea market grounds and Mr. Brooks was arguing that it was public property. Officer Don Wilkes “insisted that Mr. Brooks leave, and upon the insisting Mr. Brooks got into his car [a station wagon] and drove out onto the highway.” After going á short distance on the highway, Mr. Brooks “came back on to the market” at the first entrance. Mr. Terrell was distracted by an irrelevant matter, but Officer Wilkes proceeded, without Mr. Terrell, toward Mr. Brooks. Mr. Terrell testified that after his momentary distraction, he saw a “scuffle” in which the officers and Mr. Brooks were apparently engaged. Mr. Terrell testified that the officers then “brought Mr. Brooks back up to the gate house and we called the county officers.” He said the officers “showed me a gun they had taken off of Mr. Brooks during the scuffle.”
On cross-examination of Mr. Terrell by defendant pro se, the witness testified he had a permit to do business on Sunday, and the public in general was invited and became “guests of the market.” He testified he knew Mr. Brooks, but did not know how long Mr. Brooks had been coming to the market, that Mr. Brooks “had a place there for about two years ... with a permit” from the market. During further cross-examination óf Mr. Terrell by defendant, the witness testified as to what he had previously said or previously testified while the case was in the district court. The witness admitted he was “wrong” as to what he had said the defendant told him over the telephone. He explained this as follows:
“... Over a 30 minute conversation on the telephone I can’t remember every word and the yellow bellied automatically goes with something else and I assume that is what you said which it was ‘liar.’ You said ‘yellow bellied liar.’ That was my mistake.”
According to the testimony of Officer Don Wilkes, a police officer with the City of Gadsden, .he and his wife, also a Gadsden police officer, were “operating” as police officers for Milton Terrell at the time of the incident involved. A seller at the market came to the gate house and told the witness and his wife what Mr. Brooks was doing; then he, his wife, and Mr. Terrell “located Mr. Brooks and Mr. Terrell told him that he did want him to leave the property,” at which time Mr. Brooks “started arguing with us” to the effect “that this was a public place” and that “we couldn’t tell him to leave.” He said that the defend *513 ant then “got in his car, turned onto 278,” and then “turned back in onto the flea market property and parked his car back in the parking lot and started getting out.” He further testified that he, Mr. Terrell, and Mrs. Wilkes then went back to the automobile where defendant was and informed him “that he was under arrest for trespassing, and I got out my handcuffs and I had one handcuff already placed on defendant’s left hand when he sat back down in the car.” He further testified:
“He reached — started reaching up under his jacket and when he reached his right hand under his jacket I saw a gun and his hand got hold of the gun and when he started bringing the gun out I got hold of the gun also at the same time and there was a struggle and I got the gun away from him.”
“Q. Then what did you do?
“A. I placed the gun up on top of the car out of the reach of Mr. Brooks and myself and proceeded to handcuff him and got him out of the car.
“Q. Okay. And then did you turn him over to some other police authorities? “A. Yes, sir. We took him up to the office and called the County and they come out and got him.”
On cross-examination of the witness, he testified, inter alia:
“Q. You are telling me that Tony Reynolds, Commissioner of the Police, told you that you could go over there and wear a Gadsden uniform as a security guard?
“A. Yes, sir, I am because he is the one that got me the job.”
Before the State rested its case, defendant developed on further cross-examination of Mr. Terrell that for “the last three years” the defendant was a seller at the flea market, that the defendant sold “Moon pies,” but the witness denied that defendant’s “selling Moon pies” had anything to do with defendant’s being arrested that day.
The first witness called by the defendant was Mr. L.G. Baker, who testified on direct examination:
“Q. What, if anything, did Mr. Terrell say to you in reference to my selling Moon pies down there, or did you say to him?
“A. Well, I asked him, I said, ‘You really didn’t want him down here to start with, did you?’ He said, ‘No, I didn’t.’ I said, ‘He was selling Moon pies and candy and interfering with your selling donuts and so forth,’ and he said, ‘That’s right.’ ”
One of the witnesses called for defendant was Gadsden’s City Commissioner Tony Reynolds, who testified, inter alia, that, anything that denotes that one “is an officer of the City of Gadsden” he is not to wear when he works on duty outside of the city limits. The witness testified on cross-examination that a Gadsden police officer has “the authority to make arrests even when he is not in uniform.” Other witnesses testifying on call of the defendant were Mr. Benny Hunt, Mr. Ray Stocks, Mr. Dan Wilson, and Mr. Carl Bagwell. Mr. Hunt testified that he had known defendant about 40 years, that he had never heard of the defendant “using profanity or drinking or anything of that kind.” Mr. Stocks testified that defendant’s reputation in his community was “good, very good,” that he had never heard of defendant’s “drinking” and had never heard defendant “curse.”
Mr. Dan Wilson testified that he went with the defendant to pick up defendant’s “station wagon ... after the previous trial,” the trial in the district court; he said the “keys” were not with the station wagon at the time, that he heard the wrecker driver phone Mr. Terrell, and then defendant told the witness that Mr. Terrell said “he found the keys” and that Mr. Terrell soon brought the keys to defendant. The witness further testified that he thought the defendant’s “character” was good. Mr. Carl Bagwell testified that he “would term” the “character” of defendant as “good,” that he had never heard defendant use profanity “unless quoting something that someone else said.” The witness further said he had seen “huge crowds” at the flea market on Sunday as many as “10 or *514 15 or 20,000,” that he had always regarded it as a public place, where people came and went “without any thought of trespassing” and that he had never heard of anybody else “being arrested there for trespassing.”
Either party may understandably feel that the foregoing summary of the evidence does not contain some items of evidence that should have been included, but the writer of this opinion believes that the summary suffices for a proper consideration and determination of the six issues presented on appeal, which are now discussed.
I
By the first issue presented in appellant’s brief, he says, “the trespass law of which defendant was convicted under is highly unconstitutional.” A similar contention was made by defendant at the conclusion of the court’s oral charge to the jury, when the trial court gave the parties an opportunity to object or except to any part of the oral charge, as shown by the following part of the transcript of the proceedings:
“MR. BROOKS: Well, I think that some of the laws mentioned are unconstitutional — highly unconstitutional.
“THE COURT: Well, you need to specify what they are or except as a general exception.
“MR. BROOKS: Well, trespass in a public place like that when you don’t even dream of such a thing.
“THE COURT: All right.
“MR. BROOKS: I haven’t been back and I don’t intent to go back now that I know that. It was strictly that I was unaware.
“THE COURT: Any other exceptions?
“MR. BROOKS: Well, as far as bearing arms, my life has been threatened years and years ago.
“THE COURT: Wait a minute. That has nothing to do with the courts [sic, but which obviously is a typographical error by reason of the omission of an apostrophe before s]. Do you have any exceptions to the courts [sic] charge?
“MR. BROOKS: I got off course a little there.”
The only argument offered by appellant in his brief on appeal as to the issue under consideration is the following:
“AS TO OBJECTION ON THE GROUNDS OF TRESPASS LAW UNDER WHICH THIS TRIAL WAS CONDUCTED, IT WAS PROVEN MANY TIMES OVER BY MARTIN LUTHER KING, JR., TO BE UNCONSTITUTIONAL. IF IT HAD NOT BEEN PROVEN HE WOULD NOT HAVE GOTTEN HIS 1964 BILL OF RIGHTS AND LESTER MADDOX WOULD STILL BE ORDERING AX HANDLES.”
We decline to pass upon any question as to the constitutionality of Alabama Criminal Code § 13A-7-4, defining and proscribing the subject of criminal trespass in the third degree, which first became a part of the legislative law of Alabama upon the effective date of Acts 1977, No. 607, p. 812, § 2607, but we do reject appellant’s contention as illustrated by his references to Martin Luther King, Jr., and Lester Maddox. For whatever connection it may have to the issue under consideration, we quote from a colloquy between the trial court and the defendant soon after the jury had returned its verdict and been excused as jurors in the case and defendant had announced that he desired an appeal, when the following occurred:
“THE COURT: The Clerk’s office. She is responsible for handling appeals. She will tell you what you have to do.
“MR. BROOKS: Now, have I got any room on this to ask that this be throwed out because of the fact that all of the blacks were excluded from the jury?
“THE COURT: Are you black?
“MR. BROOKS: No, but I just thought—
“THE COURT: —that doesn’t have anything to do with you, does it?
“MR. BROOKS: I just thought that—
“THE COURT: I wouldn’t think so. I mean you can raise that.
“MR. BROOKS: In other words, I would have preferred to have some on it.
*515 “THE COURT: Well, I don’t know of any law about that. Again, this is a matter that really you should take up with an attorney.
“MR. BROOKS: Well, I will. In other words, it has worked pretty nearly like I figured it would.”
II.
Appellant’s second issue is thus captioned in his brief:
“THE ARRESTING OFFICER WAS NOT ACTING IN AN OFFICIAL CAPACITY AS LAW OFFICER FOR CITY OF GADSDEN, SINCE HE WAS OUTSIDE CITY LIMITS AND POLICE JURISDICTION OF GADSDEN, ALABAMA.”
This contention of appellant is contrary to Code of Alabama 1975, § 15-10-1, which provides:
“An arrest may be made, under a warrant or without a warrant, by any sheriff or other officer acting as sheriff or his deputy, or by any constable, acting within their respective counties, or by any marshal, deputy marshal, or policeman of any incorporated city or town within the limits of the county.”
III.
By his third issue, appellant says, “THE COURT ERRED IN OFFERING AND GIVING THE PROSECUTING ATTORNEY LEGAL ADVICE.” In appellant’s reply brief, he refers to a colloquy between the trial judge and the attorney engaged as the special prosecutor for the State relative to whether Mr. Terrell would be excused from the rule and thereby be allowed to remain in the courtroom during the trial of the case. The transcript of the proceedings discloses that just after the jury had been selected to try the case and the probable “witnesses were brought into the courtroom and sworn,” the following occurred:
“THE COURT: Do you want the Rule?
“MR. HENSLEY: Yes, sir.
“THE COURT: All right, all witnesses who are not parties will have to remain outside the courtroom until you are called to testify. While you are out there don’t discuss the case except with the attorneys or with the party representing himself.
“MR. HENSLEY: Mr. Terrell, you will have to remain outside during the trial.
“THE COURT: Mr. Hensley—
“Mr. Terrell before you depart, would you all come forward?
“(Whereupon the following side bar discussion took place out of the hearing of the jury:)
“THE COURT: There is a new law that was passed by the Legislature this term that states that regardless of previous rules that any victim is allowed to remain in the courtroom during any proceedings affecting his rights. So I am going to allow him to stay in the courtroom.
“MR. HENSLEY: Okay.”
Although we do not question appellant’s sincerity in this contention, we assure him, as to the statements of the trial judge in the particular quoted, he was not showing any partiality to the attorney for the State but, on the contrary, was proceeding as he should have done in making it clear to all concerned that Mr. Terrell was entitled, as a matter of law, to be excused from the rule, that is, to remain in the courtroom while other witnesses in the ease were testifying.
IV.
Appellant’s fourth issue is thus captioned in his brief:
“THE COURT ALLOWED TESTIMONY FROM WITNESSES (TWO PROSECUTING) WITNESSES WITH FULL KNOWLEDGE THAT THEY WERE LYING OF WHICH I COULD HAVE OBJECTED TOO [SIC], BUT HAVING DONE SO SEVERAL TIMES AND BEING OVERRULED BY THE COURT I CHOSE TO DO IT IN THIS MANNER.”
We do not question the sincerity of appellant in his unnecessarily strong language in criticism of the testimony of the witnesses for the prosecution. Nevertheless, we are *516 not persuaded that the trial judge is charged by this issue presented by appellant of condoning perjury by a witness.
That defendant was not represented by counsel on trial made the case one that was more difficult for the trial judge to try than otherwise, but he handled the case throughout with becoming courtesy to defendant.
V.
By his fifth issue, appellant contends, “THIS IS DISCRIMINATORY AND CERTAINLY AN INFRINGEMENT ON MY CIVIL RIGHTS.” We do not doubt appellant’s sincerity in making this contention, which appears to be directed at the action of Mr. Terrell and persons acting on behalf of Mr. Terrell, and possibly at the verdict of the jury. The issue does not present any basis for finding error prejudicial to defendant. The transcript of the proceedings shows that the last words stated to the trial judge by defendant were the following:
“MR. BROOKS: —Well, I’m not going to say you was wrong. I’m going to say it was almost a solid female jury and there was no blacks left on it. I like men to judge me better than a woman by far because I know I’m not that good looking. They look at that.”
VI.
As a final issue, appellant says in his reply brief, “THERE WAS NOT SUFFICIENT EVIDENCE TO SUPPORT THE VERDICT.” Nevertheless, he has been fairly tried, and there was substantial evidence that he was guilty of the offenses charged in both cases. He never asked for a new trial; he has never presented any motion to the trial court to the effect that the verdict of the jury was against the weight of the evidence.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.